**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SUSAN H. CHADD, as personal representative of the Estate of Robert M. Boardman, deceased, and for herself, | No. 12-36023 |
| *Plaintiff-Appellant*, | D.C. No. 3:11-cv-05894-RJB |
| v. | |
| UNITED STATES OF AMERICA, NATIONAL PARK SERVICE, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, Senior District Judge, Presiding

Argued and Submitted
May 16, 2014—Seattle, Washington

Filed July 27, 2015

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge Berzon;
Dissent by Judge Kleinfeld

# SUMMARY*

## Federal Tort Claims Act

The panel affirmed the district court's dismissal for lack of subject matter jurisdiction of a Federal Tort Claims Act action brought against the United States alleging claims arising from a fatal mountain goat attack on an Olympic National Park visitor.

The plaintiff, the wife of the deceased Park visitor, alleged that Park officials breached their duty of reasonable care by failing to destroy the goat in the years leading up to her husband's death.

The FTCA's discretionary function exception retains the United States' sovereign immunity for any claim based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government."

The panel held that the discretionary function exception applied. At step one of the discretionary function analysis, the panel held that there was no extant statute, regulation, or policy directive that required Park officials to destroy the goat prior to the Park visitor's death, and Park officials had discretion in deciding how to manage the problematic goat. At step two of the analysis, the panel held that the Park officials' decision to use non-lethal methods to manage the

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

goat was susceptible to policy analysis, and the discretionary function exception applied.

Judge Berzon concurred with Judge O'Scannlain's opinion and its application of the discretionary function exception to the facts of the case, but she believes that *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) (holding that the government decision at issue need not be actually grounded in policy considerations, but need only be susceptible to a policy analysis), should be reconsidered.

Judge Kleinfeld dissented because he would hold that the negligence in this case fell outside the discretionary function exception.

## COUNSEL

Shelby R. Frost Lemmel, Masters Law Group, PLLC, Bainbridge Island, WA, argued the cause and filed the briefs for the plaintiff-appellant. With her on the briefs was Kenneth W. Masters, Masters Law Group, PLLC, Bainbridge Island, WA.

Teal Luthy Miller, Assistant United States Attorney, Seattle, WA, argued the cause and filed the brief for the defendant-appellee. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, U.S. Department of Justice Civil Division, Washington, DC; Jenny A. Durkan, United States Attorney, Seattle, WA; and Mark B. Stern, Appellate Staff, U.S. Department of Justice Civil Division, Washington, DC.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the United States may be sued under the Federal Tort Claims Act for the actions of the National Park Service relating to a mountain goat that attacked and killed a Park visitor.

I

A

Established in 1938, Olympic National Park ("Olympic" or the "Park") spans 922,650 acres and hosts three million visitors each year. Among the many species of animal residing in Olympic is the mountain goat, which is not native to the area, having been introduced into the Park decades ago. Mountain goats possess dangerously sharp horns, and males typically weigh around 242 pounds. Prior to the incident in this case, there had been three reported, non-lethal attacks on people by mountain goats at other national parks, none of which were known to officials at Olympic.

Normally, mountain goats are reclusive animals, but the goats at Olympic frequently seek out areas visited by humans because of the salt humans leave behind. After repeated exposure to humans, goats can become habituated to their presence, which entails the loss of the mountain goat's fear response. Around 2004, when the goat population at Olympic was near 300, officials at the Park began receiving reports that some goats were becoming habituated; by 2006, goats began displaying aggressive behavior, such as standing

their ground, following or chasing humans, pawing the ground, and rearing up.

Park officials decided to investigate the situation personally. They hiked the trails and observed the mountain goats demonstrating progressively habituated and sometimes aggressive behavior. Officials placed collars on the goats with Global Positioning System devices in order to track their movements and to collect further data.

Based on these observations, the Park began warning visitors about the goats' behavior. Visitors were given verbal warnings, and warning signs were posted on trails. Officials began employing aversive conditioning techniques, such as shooting the goats with paint balls and bean-bags, in order to change the goats' behavior. Officials focused their efforts on a few areas, including Klahhane Ridge.

Nonetheless, officials continued to receive reports in 2009 and 2010 about a large male goat chasing visitors and displaying other signs of aggression. Officials began discussing other management options for the problematic goat, but, as stated by Park Ranger Sanny Lustig, the solution "was not clear-cut." Sometime before July 30, 2010, Olympic Superintendent Karen Gustin, Wildlife Branch Chief Dr. Patti Happe, and Ranger Lustig met to discuss management options for the goat. They coordinated their reporting and hazing efforts and decided to intensify the aversive conditioning. Dr. Happe was to investigate the possibility of relocating the goat. On July 30, she emailed Washington State Department of Fish and Wildlife biologist Dr. Donny Martorello to ask whether they "had an option for translocation." She described the goat and stated that it was "not responding to [their] efforts to have him keep . . . a

greater distance from people." Dr. Happe wrote that, because the goat had been "increasingly aggressive," Olympic wished to "explore other management options for [the goat], including relocation from the area."

Over the next two months, there were continued reports of goats pawing the ground, preventing hikers from passing, and acting aggressively. On October 16, 2010, Robert Boardman and his wife, Susan Chadd, were hiking on the Switchback trail to Klahhane Ridge with a friend, Pat Willits, when a large male goat attacked Boardman, goring his leg with its horns and severing his femoral artery. Boardman died of his wound. Park officials found and destroyed a 370-pound male goat with blood on its horns within hours of the attack.

B

Chadd, on her own behalf and as representative of Boardman's estate, filed suit against the United States and the National Park Service (the "Service") under the Federal Tort Claims Act (FTCA), alleging that Park officials breached their duty of reasonable care by failing to destroy the goat in the years leading up to Boardman's death.[1] The government moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, simultaneously filing declarations and other evidence in support of the motion. The parties proceeded with discovery.

---

[1] Jacob Haverfield, Boardman's stepson, was initially a plaintiff in this case, but he later moved the district court for voluntary dismissal of his claims. For this reason, the district court's order dismissing Chadd's suit for lack of subject matter jurisdiction did not list Haverfield as a plaintiff. He is, therefore, not a party to this appeal.

On August 20, 2012, the district court granted the government's motion to dismiss.[2]  Chadd timely appealed.

## II

As a sovereign, the United States is immune from suit unless it waives such immunity.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  The United States has waived its sovereign immunity with regard to tort liability under the Federal Tort Claims Act "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  "The Act did not waive the sovereign immunity of the United States in all respects, however; Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).  Among these is the discretionary function exception contained in 28 U.S.C. § 2680(a).  *Id.*

The discretionary function exception retains the United States's sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This exception "marks the boundary between Congress' willingness to impose tort liability upon the United

---

[2] In addition to her claim regarding the Park's management of the goat in the lead-up to Boardman's death, Chadd originally claimed that the Park's response to the goat attack was deficient.  The district court dismissed that claim in a separate order, which Chadd has not appealed.

States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig*, 467 U.S. at 808. It is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814. The government bears the burden of proving that the discretionary function exception applies. *Bailey v. United States*, 623 F.3d 855, 859 (9th Cir. 2010).

The Supreme Court has established a two-step process for evaluating whether a claim falls within the discretionary function exception. First, a court examines whether the government's actions are "discretionary in nature, acts that involv[e] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation marks omitted). In making this examination, it is "the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig*, 467 U.S. at 813. "If there is . . . a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (internal quotation marks omitted).

Second, "even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23 (internal quotation marks omitted). "The exception protects only government actions and decisions based on social, economic, and political policy." *Miller v. United*

*States*, 163 F.3d 591, 593 (9th Cir. 1998) (internal quotation marks omitted).  However, the exception "is not confined to the policy or planning level" and extends to "the actions of Government agents."  *Gaubert*, 499 U.S. at 325, 323.

It is also important to bear in mind that the decision giving rise to tort liability "need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis."  *Miller*, 163 F.3d at 593.  Thus, "if a regulation allows the [governmental] employee discretion," there is "a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  *Gaubert*, 499 U.S. at 324.  In such cases, the plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."  *Id.* at 324–25.  In any event, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325.[3]

III

A

Chadd's tort suit alleges that the Service should have destroyed the goat before it killed Boardman, and that the

---

[3] Thus, the dissent's assertion that the discretionary function should be limited to an analysis of whether the government agent intended, subjectively, to exercise policy-based discretion, Dissent Slip Op. at 24, is incorrect.

Service's failure to do so constituted negligence.[4]  The first issue, then, is whether "a statute or policy directing mandatory and specific action" required the Service to destroy the goat before it attacked Boardman.  *Terbush*, 516 F.3d at 1129.  If none did, then the Service's management of the goat necessarily "involv[ed] an element of judgment or choice," and the first prong of the discretionary function exception is satisfied.  *Gaubert*, 499 U.S. at 322 (internal quotation marks omitted).

The Service's Management Policies manual (the "manual") is "the basic Service-wide policy document of the National Park Service" and is "mandatory unless specifically waived or modified by the Secretary, the Assistant Secretary, or the Director."  The government does not dispute that this manual governed the Service's actions in the lead-up to Boardman's death.  Section 8.2.5.1 of the Management Policies manual instructs, "The saving of human life will take precedence over all other management actions. . . ."  However, the manual qualifies this obligation in the

---

[4] At oral argument, counsel for Chadd argued that the Park Service's 2009 decision to begin intensive hazing of the mountain goat constituted a mandatory directive for purposes of the discretionary function exception and that the Service failed to implement its hazing policy properly.  This argument was entirely new, never having been raised in the district court or in Chadd's opening brief.  It is also a highly fact-dependent argument, which makes it difficult to evaluate without the benefit of district court findings and full briefing.  We address "only issues which are argued specifically and distinctly in a party's opening brief."  *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).  Moreover, "[i]t is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below."  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 n.15 (9th Cir. 1991).  We therefore decline to consider Chadd's argument relating to the Service's implementation of its decision to haze the goat.

following manner: "The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values." Moreover, the obligation to "reduce or remove known hazards" is limited by what is "practicable and consistent with congressionally designated purposes and mandates."

These statements indicate that there are many factors the Service must consider while ensuring human safety in the national parks, such as "park resources and values," what is "practicable," and "congressionally designated purposes and mandates." Indeed, the manual explicitly provides, "[t]hese management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level . . . ." Such discretion includes "whether to . . . eliminate potentially dangerous animals."

The manual also contains guidance specific to exotic (that is, non-native) species, such as the mountain goats at Olympic. It declares that such species "will be managed—up to and including eradication—if (1) control is prudent and feasible, and (2) the exotic species . . . creates a hazard to public safety." How exotic species are to be managed is not specified. The manual, then, imposes no particular, mandatory course of action for managing an exotic animal that is threatening public safety.

Nor does Olympic's park-specific Nuisance and Hazardous Management Animal Plan. That document

outlines various "management objectives" and "management alternatives," but nowhere does it require Park officials to use a particular management technique when confronted with a dangerous, exotic species. In fact, the plan indicates that different species and contexts will require different management options, as when it notes, "For some species, such as black bears, a long history of management failures and successes exists . . . . For other species, such as cougars, few proven management techniques exist." Chadd points to Superintendent Gustin's statement that the Service "move[s] to the next level [of management techniques] or series of levels" if "the problem isn't going away or doesn't seem to be resolved," but Gustin's statement does not indicate that there is a general policy or directive *requiring* such action or prescribing the *timing* of it. As it is, nothing in the plan mandates an escalation of management techniques.

Finally, Olympic's Mountain Goat Action Plan lists three forms of hazing as appropriate incident management techniques, but it does not specify how or when they should be deployed. The Mountain Goat Action Plan does not even mention animal destruction, in contrast with the Cougar Action Plan. There was, therefore, no extant statute, regulation, or policy directive that required Park officials to destroy the goat prior to Boardman's death.

Indeed, Chadd acknowledges as much. In her reply brief, Chadd states, "Contrary to the government's principal argument, Chadd does not argue that there is a mandatory directive prescribing a specific course of conduct." Instead, "[r]easonable care, not a 'mandatory directive,' required [Park officials] to shoot the goat." But whether reasonable care required such action goes to the merits of Chadd's negligence claim, not to the question of whether Park officials

had discretion in deciding how to manage the problematic goat. Chadd might very well be correct that Park officials abused their discretion in a tortious manner, but, at step one of the discretionary-function-exception analysis, all that matters is that there was, in fact, discretion. *See Gaubert*, 499 U.S. at 322.

B

1

Chadd focuses her arguments almost exclusively on the second step of the discretionary function analysis. She begins by arguing that because the government is liable for a "garden-variety tort, not a high-level policy decision," applying the discretionary tort exception would "contradict[] the sovereign-immunity waiver at the heart of the FTCA." *Gaubert*, however, forecloses that argument. In *Gaubert*, the Supreme Court made clear that the exception "is not confined to the policy or planning level" and extends to "the actions of Government agents." 499 U.S. at 325, 323. It does not matter, then, if the decision at issue was made by low-level government officials, rather than by high-level policymakers. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig*, 467 U.S. at 813; *see also Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (stating that "the applicability of the exception does not depend on whether the relevant decision was made by an individual at the 'operational' or 'planning' level").

2

Chadd also contends that Park officials "had only one choice: comply with their own policies requiring them to prioritize human life and kill the goat." As discussed above, Chadd's reply brief disclaims the argument that "there is a mandatory directive prescribing a specific course of conduct." Instead, her argument that Park officials had "only one choice" seems to be an echo of her claim that "[r]easonable care, not a 'mandatory directive,' required [Park officials] to shoot the goat." But whether there was only one reasonable course of action is not the relevant question for determining subject matter jurisdiction under § 2680(a). Rather, the question is whether the course of action chosen was "*susceptible* to a policy analysis," *Miller*, 163 F.3d at 593 (emphasis added), even if the action constituted an abuse of policy discretion, *see Bailey*, 623 F.3d at 861 (noting that "the discretionary function exception provides immunity even to abuses of discretion"). With regard to the discretionary function exception, our analysis of subject matter jurisdiction is distinct from our analysis of the merits. Chadd's argument conflates these separate inquiries and must be rejected.

3

Chadd's principal argument relies on our decision in *Whisnant*, where we construed past precedent as holding that "the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not." 400 F.3d at 1181 (emphasis omitted). This distinction between policy design and implementation is only relevant at the second step of the discretionary function analysis.

In *Whisnant*, the plaintiff delivered seafood products to a military commissary, causing him to come into contact with "toxic mold the government negligently allowed to colonize the commissary's meat department over a period of three years." *Id.* at 1179. This Court held that, although "[n]o statute, policy, or regulation prescribed the specific manner in which the commissary was to be inspected or a specific course of conduct for addressing mold," the decision to remove the mold was not one protected by the discretionary function exception. *Id.* at 1181, 1183. As *Whisnant* stated, "Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy." *Id.* at 1183. "Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold . . . cannot be protected under the discretionary function exception." *Id.*

Chadd believes the same is true of her case. In her view, Olympic's "failure to escalate up the levels of [the Nuisance and Hazardous Management Animal Plan]" was a failure to implement a safety measure, just as the failure to remove mold was in *Whisnant*. She points to the repeated acknowledgments by Park officials that the goat was dangerous and aggressive; the fact that the hazing techniques used by officials were known to have only a "temporary" effect; Gustin's statement that the usual practice is to "ramp up" management techniques when one is not working; and the history of incidents surrounding mountain goats in Olympic. Chadd believes the goat was an "obvious health hazard" that was "a matter of safety and not policy." *Whisnant*, 400 F.3d at 1183.

Although *Whisnant* drew the distinction between policy design and implementation, it also made clear that the "implementation of a government policy *is* shielded where the *implementation itself* implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire." *Id.* at 1182 n.3 (second emphasis added). Thus, this Court has subsequently stated that "so long as a decision involves *even two competing [policy] interests*, it is 'susceptible' to policy analysis and is thus protected by the discretionary function exception." *Bailey*, 623 F.3d at 863 (emphasis added). What distinguished the mold situation in *Whisnant* is that there was *no* legitimate reason for the commissary not to eliminate the toxic mold.[5] But, at step two of the discretionary-function-exception analysis, where there is even *one* policy reason why officials may decide not to take a particular course of action to address a safety concern, the exception applies. *Id.*; *see also Soldano v. United States*, 453 F.3d 1140, 1150 (9th Cir. 2006) (holding that the discretionary function exception did not apply because there was "no reason" justifying the government's failure to implement a safety measure); *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (citing only two competing policy considerations in holding that the discretionary function exception applied); *Miller*, 163 F.3d at 595–96 (describing the competing policy considerations involved in deciding how to address multiple forest fires).

---

[5] The commissary cited budgetary concerns, but this Court has repeatedly held that budgetary considerations, standing alone, cannot form the basis for the application of the discretionary function exception. *Whisnant*, 400 F.3d at 1183–84; *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195–96 (9th Cir. 1987).

As the district court noted, park officials evaluated multiple policy considerations in deciding how to manage the problematic goat.  Although the goat, as an exotic species, was not entitled to the same level of protection or consideration as native species at Olympic, the public desired to see the goats.  Both Dr. Happe and Olympic Deputy Superintendent Todd Suess submitted declarations stating, "The mountain goat is an appealing, iconic animal within Olympic . . . and is an attraction to park visitors.  In the past, the park has encountered significant opposition to possible plans to remove some of the goats."  In light of the public's interest in preserving Olympic's goats, Park officials implemented several non-lethal management options, such as hazing, and explored the possibility of relocating the goat.

Chadd counters that preservation of the goats is contrary to their status as an exotic species and violates the Service's policy of prioritizing human safety over all other considerations.  But from the premise that the goats are not entitled to special protection as a matter of policy, it does not follow that Park officials ought to exterminate them.  Native species in the Park have a default level of protection that mountain goats do not enjoy, but Chadd has pointed to nothing that forbids Park officials from protecting the goats to facilitate the public's enjoyment of the species.[6]  There is no contradiction between the goat's status as an exotic

---

[6] The officials' interest in facilitating the public's enjoyment of the Park's wildlife also distinguishes this case from the "routine tort case" the dissent claims is analogous to this one—that of a homeowner and his dangerous dog.  Whereas the homeowner can claim no legitimate interest in the public's enjoyment of his dangerous pet, Park officials engaged in wildlife management must consider the public's interest in enjoying the wildlife at the Park in its natural state.

species and Olympic's desire to implement safety measures short of destruction.

As for the policy of prioritizing human safety, it is clear that the means by which local officials ensure human safety "is left to the discretion of superintendents and other decision-makers at the park level." *See supra* Part III.A. Such discretion includes decisions about animal destruction. Moreover, the Service's policy manual lists several competing objectives that Park officials had to consider in assessing the goat situation, including "park resources and values."

Thus, in addition to the policy issues mentioned by Park officials, the Service's guidelines cite many competing considerations that Olympic should have taken into account when deciding how to deal with the problematic goat. Whether Park officials actually took into consideration the policy objectives listed in the Service's guidelines is irrelevant because the challenged decision "need not be *actually* grounded in policy considerations, but must be, by its nature, *susceptible* to a policy analysis." *Miller*, 163 F.3d at 593 (emphases added). Indeed, "if a regulation allows the [governmental] employee discretion," as it did here, there is "a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324. Park officials need only point to "some support in the record that the decisions taken [were] 'susceptible' to policy analysis for the discretionary function exception to apply," and that standard is more than met here. *Terbush*, 516 F.3d at 1134. The holding of *Whisnant* is thus inapplicable, as the implementation of the safety regulation was itself subject to competing policy concerns. *Bailey*,

623 F.3d at 863. Because the decision to use non-lethal methods to manage the goat was susceptible to policy analysis, the discretionary function exception applies.

IV

The district court's order dismissing this case for lack of subject matter jurisdiction is **AFFIRMED.**

---

BERZON, Circuit Judge, concurring:

I concur in Judge O'Scannlain's opinion, which I believe correctly applies our precedents regarding the discretionary function exception to the troubling facts of this case. I agree with Judge Kleinfeld, however, that our jurisprudence in this area has gone off the rails. In particular, in my view, *Miller v. United States* was wrong when it concluded that the decision at issue "need not be actually grounded in policy considerations" but need only be, "by its nature, susceptible to a policy analysis." 163 F.3d 591, 593 (9th Cir. 1998); *see also GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174, 1178 (9th Cir. 2002).

*Miller* purported to derive that rule from *United States v. Gaubert*, 499 U.S. 315 (1991). But that is not what *Gaubert* says—it says the opposite, that "the exception protects *only* governmental actions and decisions *based on* considerations of public policy." *Id.* at 323 (emphasis added, internal quotation marks omitted).

*Gaubert* then went on to indicate that *susceptibility* to a policy analysis, which *Miller* elevated to the ultimate

question, was *relevant* insofar as it established a strong *presumption* "that the agent's acts are [*in fact*] grounded in policy." *Id.* at 324. But nothing in *Gaubert* suggests that the presumption is not rebuttable, or switches the foundational question from whether the decision *was* "based on considerations of public policy" to whether it hypothetically could have been.

Were I considering the issue in the first instance, I would hold that the *Gaubert* presumption can be rebutted with a clear showing that a decision was not *actually* based on policy considerations, even if the decision was *susceptible* to a hypothetical policy analysis. In other words, in my view the proper rule is this: In *every* case, the relevant decision *does* need to be "actually grounded in policy considerations," but, as a practical and evidentiary matter, the fact that a decision is "susceptible to a policy analysis" creates a strong presumption that it was actually made for policy reasons, rebuttable only by persuasive evidence to the contrary. *See Miller*, 163 F.3d at 593.

*Miller* is the law of our circuit, however, and contrary to Judge Kleinfeld's wishful thinking, has not been limited or undermined. *See GATX/Airlog Co.*, 286 F.3d at 1174, 1178. While I believe *Miller* should be reconsidered, we are bound to apply it. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). I therefore, with some reluctance, concur.

---

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent.

A Supreme Court concurrence commented that the courts have had "difficulty in applying" the rule for deciding which government actions fall within the discretionary function exception.[1]    Indeed.    In this case, we have allowed the discretionary function exception to swallow the statutory rule that the federal government waives its sovereign immunity for torts for which an ordinary person would be liable.  Under the Court's opinions in *United States v. Gaubert*[2] and *Berkovitz v. United States*,[3] the negligence in this case falls outside the discretionary function exception.  The majority mistakenly expands the exception and contracts the rule, and thereby creates tension with our recent decision in *Young v. United States*[4] as well as *Whisnant v. United States*[5] and *Bear Medicine v. United States*.[6]

The Federal Tort Claims Act says that the government "shall be liable . . . [for torts] in the same manner and to the same extent as a private individual under like circumstances."[7]  This broad waiver is subject to an exception for claims  "based upon the exercise or performance or the

---

[1] *United States v. Gaubert*, 499 U.S. 315, 335 (1991) (Scalia, J., concurring in part and concurring in the judgment).

[2] 499 U.S. 315 (1991).

[3] 486 U.S. 531 (1988).

[4] 769 F.3d 1047 (9th Cir. 2014).

[5] 400 F.3d 1177 (9th Cir. 2005).

[6] 241 F.3d 1208 (9th Cir. 2001).

[7] 28 U.S.C. § 2674.

failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused."[8] The language appears clear, but the application is not.

The fundamental problem the courts have had applying the exception is that all but strict liability torts involve the exercise of discretion. How much slower than the speed limit should I drive in rain and fog?[9] Should I trim this tree because a limb overhangs the sidewalk and could conceivably fall on a pedestrian in a windstorm?[10] Or shall I leave it alone because of the aesthetic pleasure it gives to me and passersby? Must I have my dog put down because it may bite the child next door if he trespasses, or can I continue to enjoy my dog?[11] Shall I (a physician) get an expensive CT scan for this patient to rule out a highly unlikely diagnosis?[12] Shall we quit manufacturing our cheap ladders and triple the price to make ladders that do not collapse or tip even when people use them improperly?[13] Replace all the seats in our 747's with new, more fire-resistant seats? Shall we recall all our chain saws, or all our cars, because of very slight risks?

---

[8] *Id.* § 2680(a).

[9] *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 16 cmt. e (2010) [hereinafter Restatement (Third) of Torts].

[10] *See id.* § 7 cmt. b, illus. 1.

[11] *See id.* § 23 cmt. i; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 51 cmt. l (2012).

[12] *See* Restatement (Third) of Torts, *supra* note 9, § 26 cmt. n.

[13] *See* Restatement (Third) of Torts: Products Liability § 2 cmt. d, cmt. p, illus. 20 (1998).

If those were the kinds of discretionary decisions the statutory exception meant to cover, then the statutory "private individual" rule would be nearly nullified, applying only to negligence per se, where a statute or regulation left no discretion in the matter. The Supreme Court has grappled with this verbal difficulty and narrowed the discretionary function exception to the kind of policy discretion that only the government exercises. Even this limitation is hard to apply, because the homeowner deciding whether to cut the tree limbs herself balances the public interest in a pretty walk down the street against the public interest in avoidance of the risk from a falling branch. So policy choices, for the exception to be cabined at all, have to be limited to peculiarly governmental ones. This is difficult too, because the private interests that private individuals have often coincide with public interests, as in lower prices or greater aesthetic appeal, and government undertakes many tasks generally or previously performed privately.

The holding of the majority opinion appears to be that if no law or regulation mandates or prohibits the government's action or inaction, and even one "policy" reason can be adduced before or after to justify the government's action or inaction, then the exception applies. This limits the waiver of sovereign immunity to negligence per se and conduct that in no way can be rationalized after the fact. The majority fails to draw the distinction that the Supreme Court has struggled to formulate, between a "policy" reason and a mere after-the-fact rationalization or personal preference of a government employee or official.

There never was a park policy to leave dangerous animals alone because "the public desired to see the goats," the policy reason upon which the majority relies. This was a park, not

a zoo with caged animals, and the express formal park policy was to protect the public from dangerous animals. Only after the goat killed Mr. Boardman did the Park come up with the rationalization for their inaction that "the public desired to see the goats." The park staffs shot and killed the goat immediately after it killed Mr. Boardman. The discretionary function exception should be construed as limited to decisions where a government policy decision guided the exercise of discretion, and not expanded to situations where it did not, even when a policy judgment can subsequently be imagined and articulated. We rejected such an after-the-fact rationalization in *Bear Medicine v. United States*: "our inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield."[14]

Letting an identified aggressive 370-pound goat threaten park visitors and rangers for years until it killed one amounted to a failure to implement the formally established park policy for managing dangerous animals. Written park policy provided a series of steps for dealing with animals dangerous to park visitors, from frightening the animal away to removing or killing it. The Park had used the earlier steps, including repeatedly shooting the goat with nonlethal loads such as beanbags, but they did not work. Yet the superintendent left the animal free to terrorize tourists for another summer season instead of following the next step of the written policy, removing or killing it. This was "ordinary garden-variety negligence,"[15] like keeping a dog that has

---

[14] 241 F.3d 1208, 1216 (9th Cir. 2001).

[15] *ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987) (internal quotation marks omitted).

already bitten a child, and subsequently bites another. Official park policy for Olympic National Park put protection of human life ahead of protection of animal life, and did not protect nonindigenous animals such as this goat. Failure to implement this policy was not another policy, just ordinary negligence.

## FACTS

Like a lot of national park visitors, the Boardmans and their friend were aging tourists. Mr. Boardman, 63, was killed by a horned animal bigger than an NFL lineman, that had been the terror of the Park for four years. The 370-pound goat spotted them as they enjoyed a picnic, and approached, pawing the ground, and menacing them. It was too close to throw rocks at it, so Mr. Boardman tried to hold it off with his walking stick as they retreated. They walked away from it for about a mile, with Mr. Boardman in the rear protecting the ladies with his stick, but the goat would not go away. Then the goat attacked Mr. Boardman, gored him, and stood over him, keeping assistance away, as he bled to death. Too late for Mr. Boardman, park rangers finally carried out park policy for dangerous animals. A couple of hours after it had killed Mr. Boardman, park rangers easily found the goat about a half mile away, his horns stained with Mr. Boardman's blood, and shot it dead.

This was no random, unpredictable, animal attack. Park personnel knew this particular goat and had been dealing with its unusual, aggressive behavior toward them and toward park visitors for four years. The park personnel had even named it, "Klahhane Billy," whom they well knew to be the terror of the heavily used Switchback Trail on Klahhane Ridge. A written report in 2006, four years before the goat killed Mr.

Boardman, said that a goat aggressively followed hikers and retreated only after being beaten with a walking stick. The Park received four more reports of an aggressive goat the next year, 2007. These were not just reports from visitors of perhaps timorous temperaments. One was from a park ranger, who said that the goat blocked the trail, chased her for two miles, and tried to charge her.

Recognizing the danger, rangers began monitoring the goats and placed warning signs at trail heads. Three years before the goat killed Mr. Boardman, 2007, eleven goats were captured and collared with GPS units. That is when Klahhane Billy was identified as the "only . . . collared animal in this area that was recorded to have aggressive behavior." Two years before it killed Mr. Boardman, in 2008, when the park officials knew which goat was the problem, a hiker reported that the goat chased him at a "jogging pace." Since the park officials knew that Klahhane Billy threatened people and did not fear them, park personnel began using what they called "aversive conditioning techniques." That meant yelling and throwing rocks at Klahhane Billy to teach it to fear and avoid people. The "aversive conditioning" did not work. Hikers continued to report aggressive goat incidents as the 2008 season drew to a close.

By the next summer, 2009, park personnel knew that Klahhane Billy was dangerous and that the "aversive conditioning techniques" had failed. The Park Superintendent, Karen Gustin, had been so advised. The Park's Wildlife Branch Chief and biologist, Dr. Patti Happe, sent her an email in June of 2009, a year before it killed Mr. Boardman, warning that Klahhane Billy was getting worse. She was getting reports of risk of injury even from her

predecessor, and "it may be only an [sic] matter of time until someone is hurt":

> As you know, this goat has been a problem for several years now . . . and is behaving in an increasing[ly] aggressive manner. This year I am getting reports of people feeling that the[y] are at risk of injury (including my predecessor in this job who has a lot of experience working with goats).
>
> He is definitely negatively impacting the Park visitors ability to experience and enjoy the area trails, and *it may be only an [sic] matter of time until someone is hurt*. (Emphasis added).

Two days after the email, Gustin directed more aversive conditioning, and rangers began patrolling with paintball and bean-bag guns to shoot the goat.

During the 2009 season, the escalated aversive conditioning continued to fail. The next month, July 2009, Billy charged a family twice. Fortunately, the father was able to protect his wife and children by throwing rocks at it. Park rangers then shot the goat with paintballs and bean bags, but even having been shot with these weapons (which tourists visiting national parks would not have), Billy returned to the trail within fifteen minutes. Nor did the impacts from these weapons persuade the goat to avoid people. In October 2009, Billy chased another park visitor down the trail.

The next season, the summer of 2010, reports got worse. Klahhane Billy butted a hiker with its head but fortunately did

not gore him. On July 5, 2010, another park ranger, Sanny Lustig, sent an email to park employees referencing multiple aggressive attacks by this identified animal. She wrote "his MO is to follow people to the trailhead, rear up and come in close proximity brandishing his hooves, and the latest was an actual report of a head butt. He's big, he's not wary, he pesters, he looks mean and as if he'll get aggressive."

In response to this escalating aggression, Dr. Patti Happe, the chief biologist, wrote "[i]f he has indeed made contact with someone via head-butting, it may be time to talk about taking the next step before someone gets hurt." The next steps under written policy, the Park's Nuisance and Hazardous Animal Management Plan, would have been capture and release, capture and translocation, and destruction of the animal. Two days later, another biologist reported that the goat chased her. She said "I am skeptical that a bit of adverse conditioning will do much for him. He sees hundreds of harmless people every day. . . . I was shocked by how determined he was. I caught him 4 times with rocks to no effect. He could be really scary to many people."

In late July 2010, two and a half months before the goat killed Mr. Boardman, the Park, recognizing the failure of its "aversive conditioning techniques," finally decided to consider other management options including relocating the goat. Dr. Happe wrote an email to a biologist with Washington Department of Fish and Wildlife on July 30, 2010:

> As I mentioned on the phone, we have a mature billy on the [sic] at the hurricane ridge area of Olympic National Park that has become very habituated and not responding to

our efforts to have him keep at a greater distance from people. Recently, he has been becoming increasingly aggressive and park management would like to explore other management options for him, including relocation from the area.

According to Dr. Happe's subsequent email to Superintendent Gustin and other park employees, the state's biologist "was very willing to help, is thinking about alternatives ranging from relocation . . . or to captivity, and will help with the capture." Gustin replied, "[t]his sounds like good news." But despite having explored the relocation option successfully, the Park Superintendent did not do it.

The record does not show that the Park did anything about the goat at all in the next two and a half months. Nor does the record show any decision or decision-making process by the Park Superintendent, Karen Gustin, about whether to accept the state's offer to have the goat relocated to state land or have the goat killed. In October, at the end of the summer season, nothing having been done to protect park visitors, Klahhane Billy killed Mr. Boardman.

## ANALYSIS

The Federal Tort Claims Act makes the United States liable for tort claims to the same extent "as a private individual under like circumstances."[16] The Act intended to compensate those harmed by government negligence. We have held that "it should be construed liberally, and its

---

[16] 28 U.S.C. § 2674.

exceptions should be read narrowly."[17]  The exceptions are voluminous, for intentional torts such as assault, battery, malicious prosecution, libel, slander, deceit, and the like, as well as for various government functions such as tax collection and delivery of the mail,[18] and damages are limited to compensatory damages without interest.[19]  The torts for which sovereign immunity is waived are mainly traditional common-law negligence.

The exception at issue in this case, the "discretionary function" exception,  excludes from this broad waiver of immunity "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[20]  This limited exception protects only "political, social, and economic judgments that are the unique province of the Government."[21]  It therefore does not shield government negligence from liability merely on the grounds that the action or inaction involved, as almost all negligence does, some element of discretion.

---

[17] *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008) (internal quotation marks omitted).

[18] 28 U.S.C. § 2680.

[19] *Id.* § 2674.

[20] *Id.* § 2680(a).

[21] *Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001) (internal quotation marks omitted).

In determining whether this exception applies, "the question of *whether* the government was negligent is irrelevant."[22]   The question of *how* the government was negligent remains "critical."[23]   "[D]etermining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate" to determining the applicability of the discretionary function exception.[24]   The majority mistakenly characterizes Chadd's allegation of wrongdoing as challenging only the Park's failure to kill the goat, omitting the available removal option. Chadd challenges "[f]ailing to remove or destroy" the goat, analogizing Superintendent Gustin's non-decision and inaction to that of a landowner who knows of and fails to exercise reasonable care to protect invitees from an unreasonable risk of harm that the landowner cannot reasonably expect them to discover and protect themselves against.  The argument is that she knew aversive conditioning (yelling and throwing rocks at the goat and even shooting it with nonlethal weapons) had failed and the goat was getting more aggressive, yet did nothing more to protect park visitors from it.

Chadd concedes that there was no mandatory directive prescribing a specific course of conduct at a certain time. This is not a negligence-per-se case.  In negligence per se, "[a]n actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim

---

[22] *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005).

[23] *Young v. United States*, 769 F.3d 1047, 1054 (9th Cir. 2014).

[24] *Id.*

is within the class of persons the statute is designed to protect."[25]   The kind of negligence alleged in *Berkovitz v. United States*, where a federal agency issued a license to a polio vaccines manufacturer without first receiving the product safety information required by the regulation, was of that sort; the violation of law amounted to negligence.[26] Compliance with statutes and rules, though, does not preclude a finding that the actor is negligent.  "An actor's compliance with a pertinent statute, while evidence of nonnegligence, does not preclude a finding that the actor is negligent . . . for failing to adopt precautions in addition to those mandated by the statute."[27]  If the speed limit is 55, but in the darkness, ice and snow prevailing at the time, a reasonable and prudent driver would go no faster than 35 or 40, then a speed of 50, though well within the speed limit, may be negligent. Likewise, the federal government is not shielded from liability because Superintendent Gustin did not violate a specific statutory or regulatory command.  Plaintiff's case is indeed, as appellants argue, a garden-variety negligence of a land possessor case, controlled by the tort law of Washington.[28]  The exceptions to the Federal Tort Claims Act do not purport to limit the government waiver of sovereign immunity to negligence-per-se cases.

The simplistic view that if no regulation prohibited or required different conduct, then the government actor had

---

[25] Restatement (Third) of Torts, *supra* note 9, § 14.

[26] 486 U.S. 531, 542–43 (1988).

[27] Restatement (Third) of Torts, *supra* note 9, § 16(a).

[28] *See Iwai v. State*, 915 P.2d 1089, 1093 (Wash. 1996).

discretion, and if the government actor had discretion, then the discretionary function exception shields the government, is bad law, rejected by the Supreme Court.  The Park's management of the goat "involve[d] an element of judgement or choice."[29]  That is indeed the first step of analysis for the discretionary function exception under *Berkovitz v. United States*.  But just as the 55 speed limit does not immunize someone driving at 50 on ice, an element of discretion allowed to the government actor is only necessary and not sufficient to invoke the discretionary function exception.

The controlling question is whether the particular exercise of discretion was "of the kind that the discretionary function exception was designed to shield."[30]  Many attempts, none entirely successful, have been made to provide a general statement of what sorts of exercises of discretion are of this kind.  They are best sorted out and applied in light of the purposes of the waiver of sovereign immunity and the exception.  The waiver is intended to make the government responsible for garden-variety torts such as mail truck collisions occasioned by their drivers' negligence.  As the Supreme Court held in *Indian Towing Co. v. United States*, "[t]he broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws."[31]  The exception is intended to

---

[29] *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

[30] *Id.*

[31] 350 U.S. 61, 68–69 (1955).

enable government to make and act upon policy determinations without court interference with the social judgments made by the political branches. As the Court held in *United States v. Varig Airlines*, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[32]

To understand what constitutes the exercises of discretion "of the kind that the discretionary function exception was designed to shield,"[33] it is necessary to look at the cases that the exception applied.[34] The Supreme Court in *Dalehite v. United States* held that the discretionary function exception applied to the government's operation of a program for supplying fertilizer to countries at risk of famine after World War II, when the fertilizer exploded, killed many people, and leveled a town.[35] The *Dalehite* rule is that the discretionary function exception applies to "more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations."[36] Superintendent Gustin's failure to do anything about the goat when nonlethal aversive conditioning had failed falls into none of these immunized categories.

---

[32] 467 U.S. 797, 814 (1984).

[33] *Berkovitz*, 486 U.S. at 536.

[34] *See Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*, 153 F.3d 938, 946 (9th Cir. 1998).

[35] 346 U.S. 15, 42 (1953).

[36] *Id.* at 35–36.

The Court in *Indian Towing Co. v. United States* limited *Dalehite*. A tugboat had run aground because the Coast Guard failed for three weeks (not years, as in our case) to discover and repair a bad connection for the light in a lighthouse.[37] The Court held that despite operation of the lighthouse being uniquely governmental, once the government made a policy decision to operate a light at the location, it "was obligated to use due care" in operating and maintaining it.[38] Likewise, the government did not have to establish Olympic National Park, but once it made the policy decision to do so, it was obligated to exercise due care for the safety of the tourists it invited in.

The Supreme Court decisions applying the exception since *Indian Towing* have all involved high policy and complex regulatory regimes, not garden-variety torts committed in the course of day-to-day operations. All involved supervision by government of the conduct of private individuals, which this case does not. The park regulation prohibiting visitors from carrying guns to protect themselves from dangerous animals is a policy decision regulating the conduct of private individuals,[39] but this case did not involve park policy regulating visitors such as Mr. Boardman, just park execution of its own programs. *United States v. Varig Airlines* shielded Federal Aviation Administration's "type certification" allowing Boeing to use its proposed design for

---

[37] *Indian Towing Co. v. United States*, 350 U.S. 61, 62 (1955).

[38] *Id.* at 69.

[39] *Cf.* 36 C.F.R. § 2.4.

its 707 passenger jet,[40] which we relied on in *GATX/Airlog Co. v. United States*, another type certification case.[41]   The Court held that the discretionary function exception shields discretionary acts "of the Government acting in its role as a regulator of the conduct of private individuals."[42] Superintendent Gustin failing to deal with the Klahhane Billy's aggressiveness might be characterized as a regulator of a goat, but not as "a regulator of the conduct of private individuals."   The reason for the "regulator" rule is that Congress, by means of the discretionary function exception, "wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[43]

Likewise in *Berkovitz v. United States*, the government conduct involved was regulatory, licensing of polio vaccine.[44] The Court held that the exception shielded formulation of policy as to how to regulate release of vaccine, and policy judgments of officials exercising discretion in the application of these policies, but not negligent acts of officials carrying out those policy judgments rather than making them.[45]   The Court's most recent explanation of the discretionary function

---

[40] 467 U.S. 797, 815–16 (1984).

[41] 286 F.3d 1168, 1175, 1178 (9th Cir. 2002).

[42] *Varig Airlines*, 467 U.S. at 813–14.

[43] *Id.* at 814.

[44] 486 U.S. 531, 533 (1988).

[45] *Id.* at 546–48.

exception, in *United States v. Gaubert*, like *Varig Airlines*, shields government discretion in how it regulates private firms and individuals.[46]    The challenge was to how the Federal Home Loan Bank Board exercised its discretion in regulating the reorganization of a failed savings bank.  The Court rejected the view that the government's liability turns on whether the individual making the decision was of a high enough status so that her official responsibilities included an assessment of social, economic, or political policy.  "[I]t is the nature of the conduct, rather than the status of the actor that governs whether the exception applies."[47]  And *Gaubert* rejected, as *Berkovitz* had, the proposition that if the action involved an element of judgment or discretion, it was shielded.  For the exception to apply, the particular exercise of discretion must be "of the kind that the discretionary function exception was designed to shield. . . . [W]hen properly construed, the exception protects only governmental actions and decisions based on considerations of public policy."[48]  Though "[w]hen established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion," the exception does not apply where "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."[49]  No regulatory regime was involved in our case, just the day-to-day business of protecting park visitors from

---

[46] *United States v. Gaubert*, 499 U.S. 315 (1991).

[47] *Id.* at 322 (internal quotation marks omitted).

[48] *Id.* at 322–23 (internal quotation marks omitted).

[49] *Id.* at 324–25.

unsafe conditions, like the land condition we deemed not to be immunized in *Young v. United States*.[50]

The majority holds that if no statute or regulation mandates a different conduct, the exception applies as long as one "policy" reason can be articulated to justify the government's acts. Relying on a statement in *Miller v. United States* that "[t]he decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis,"[51] the majority concludes that "[w]hether Park officials actually took into consideration the policy objectives listed in the Service's guidelines is irrelevant." That is, the majority deems it "irrelevant" that Superintendent Gustin did not in fact decide against relocating or shooting the goat because park visitors liked to see the goats, or decide on a park policy to preserve all goats for this reason. The majority "misconstrues *Miller* in . . . fundamental ways."[52]

We clarified in *Bear Medicine v. United States* that the quoted language in *Miller* "was used illustratively to draw a distinction between protected discretionary activities (*e.g.*, selecting the method of supervising savings and loan associations) and unprotected discretionary activities (*e.g.*, driving a car), *not to widen the scope of the discretionary rule*."[53] The language was merely "a paraphrase of a section

---

[50] *See* 769 F.3d 1047, 1059 (9th Cir. 2014).

[51] 163 F.3d 591, 593 (9th Cir. 1998).

[52] *Bear Medicine v. United States*, 241 F.3d 1208, 1216 (9th Cir. 2001).

[53] *Id.* (emphasis added).

of the Supreme Court's opinion in *United States v. Gaubert*."[54]  *Gaubert* did not hold that any decision, so long as it is made by a high-ranking official with policymaking responsibilities, is protected if a single "policy" reason can be adduced before or after to justify the decision.  Quite the opposite.  It held that "it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies."[55]  The majority's approach amounts to adopting the rule that Justice Scalia suggested in his concurring opinion of *Gaubert*, that the exception shields any choice "that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations."[56] That is not the law articulated by the majority in *Gaubert*, nor was dealing with this goat exercise of regulatory authority, as *Gaubert* was.

To the extent we narrow the waiver of sovereign immunity, as we do in this case, we undermine the congressional decision that "[t]he United States shall be liable . . . [for torts] in the same manner and to the same extent as a private individual under like circumstances."[57]  The existence of discretion is of little value for distinguishing private individuals' negligence liability from governmental liability. The basic principle of negligence is that one "acts negligently if the person does not exercise reasonable care under all the

---

[54] *Id.*

[55] *Gaubert*, 499 U.S. at 322 (internal quotation marks omitted).

[56] *Id.* at 335 (Scalia, J., concurring in part and concurring in the judgment).

[57] 28 U.S.C. § 2674.

circumstances," considering such factors as the foreseeable likelihood of harm, the foreseeable severity of harm that may ensue, and the burden of precautions to eliminate or reduce the risk.[58]  The exercise of discretion is the essence of most negligence.  The Federal Tort Claims Act extends to the government liability for negligent exercise of discretion, except for the "political, social, and economic judgments that are the unique province of the Government,"[59] generally involving government regulation of private conduct. Congress chose to abolish the federal government's sovereign immunity for garden-variety negligence, which necessarily includes such conduct involving the exercise of discretion.

We have developed two principles relevant to the determination whether a challenged government decision was policy-based or susceptible to policy analysis.  First, "we have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not."[60]  The exception does not shield a failure to implement a safety policy even when the policy does not mandate a specific action at a certain time.[61]  This follows *Indian Towing Co. v. United States*, where once the Coast Guard decided to establish a lighthouse, failing to keep it in

---

[58] Restatement (Third) of Torts, *supra* note 9, § 3.

[59] *Bear Medicine*, 241 F.3d at 1214 (internal quotation marks omitted).

[60] *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

[61] *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987).

good working order is not immunized.[62]   Second, we may protect a failure to implement a policy if the implementation "itself implicates policy concerns."[63]   To apply this complex test, we ask whether the implementation of an established policy requires objective determinations based on professional and scientific judgment or a weighing of competing public policy considerations.[64]

In this case, no decision was made based on competing public policy considerations to let the goat continue terrorizing the tourists.  After the goat killed Mr. Boardman, Dr. Happe, the Park's chief biologist, wrote a declaration for this lawsuit saying that the goats in the Park were "iconic" and that visitors liked seeing them.  But neither she nor any other park personnel submitted any evidence that they had decided, before the goat killed Mr. Boardman, to let the goat stay in the Park for this or any other reason.

We held that the implementation of safety measures itself implicated public policy concerns where the Forest Service in *Miller v. United States* balanced competing firefighter safety and public safety interests in deciding how to fight multiple forest fires,[65] and where the Army Corp of Engineers in *Bailey v. United States* balanced its workers' safety and the public safety interests in deciding when to replace the

---

[62] 350 U.S. 61, 69 (1955).

[63] *Terbush v. United States*, 516 F.3d 1125, 1133 (9th Cir. 2008) (quoting *Whisnant*, 400 F.3d at 1182 n.3).

[64] *Soldano v. United States*, 453 F.3d 1140, 1148 (9th Cir. 2006); *Whisnant*, 400 F.3d at 1181.

[65] 163 F.3d 591, 595–96 (9th Cir. 1998).

warning signs in a flooded river.[66]  In these cases, protecting the general public would have entailed considerable risk to the lives of the federal workers.  And in both, a decision was made based upon deliberation about these considerations.  They were not after-the-fact justifications for litigation purposes, like the "policy" claim made in this case.

In *Whisnant v. United States*, we held that the government's failure to inspect a grocery store on a naval base periodically and clean up mold was not protected.[67]  Whisnant, an employee of government contractor, claimed that he became ill as a result of regular exposure to the toxic mold in the store's meat department.[68]  We held that "the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers is not a policy choice of the type the discretionary function exception shields.  Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy."[69]

In *ARA Leisure Services v. Unites States*, while the Park Service's decision to design the Denali Park Road without guardrails was protected because the Park had a policy that roads should "lie lightly upon the land," the Park's failure to maintain the road in a safe condition was not protected.[70]  The

---

[66] 623 F.3d 855, 861–62 (9th Cir. 2010).

[67] 400 F.3d 1177, 1183 (9th Cir. 2005).

[68] *Id.* at 1179.

[69] *Id.* at 1183.

[70] 831 F.2d 193, 195 (9th Cir. 1987).

road at Thoroughfare Pass in Denali National Park had eroded from an original width of twenty-eight feet to a width of 14.6 feet and had edges so soft to cause a tour bus to go off road and kill passengers.[71]  In *Bear Medicine v. United States*, a member of a tribe was fatally injured when a tree cut by an employee fell and struck him during a private logging operation that the Bureau of Indian Affairs authorized.[72]  The BIA was required to ensure that the logging operation complied with the safety regulations, but few employees were formally trained in basic safety procedures and none had been trained in first aid.[73]  The government argued that it had a policy of promoting independence in the operation of the Indian Tribes and that its actions were taken due to limited resources.  We held that even if the BIA had discretion in its monitoring of the logging operation, its actions in carrying out its responsibilities (i.e., failure to require safety measures or training) were not protected policy judgments.[74]  "[S]afety measures, once undertaken, cannot be shortchanged in the name of policy.  Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not susceptible to a policy analysis."[75]  Likewise here, failure to implement established park policy was not itself an immunized policy judgment.

---

[71] *Id.*

[72] 241 F.3d 1208, 1215 (9th Cir. 2001).

[73] *Id.* at 1212.

[74] *Id.* at 1215.

[75] *Id.* at 1216–17 (internal quotation marks omitted).

Other cases have ruled similarly. In *Oberson v. United States Department of Agriculture*, the discretionary function exception did not protect the Forest Service's failure to post a warning or remedy a hazard on a snowmobile trail, because it did not involve considerations of public policy.[76] In *Soldano v. United States*, the exception barred a claim that the Park Service negligently designed a road without warning signs, but it did not immunize the Park's negligence in setting a speed limit for the road, because the speed limit decision involved "objective safety criteria" in a park road plan.[77] In *Summers v. United States*, the exception did not protect the Park Service's failure to warn visitors of hot coals on a beach where fires were permitted, because (as in the case before us) it "resemble[d] more a departure from the safety considerations established in Service policies" than a public policy-based decision.[78] In *Bolt v. United States*, the Army's failure to remove snow and ice from parking lot was not protected.[79] All these involved the exercise of discretion, as almost all negligence does. But as in this case, the particular exercise of discretion at issue did not require a weighing of public policy considerations.

The policies actually enacted for Olympic National Park, before the goat killed Mr. Boardman, prioritized protecting visitors' lives over protecting killer goats, "iconic" or not, aesthetically pleasing to visitors or not. Under the National

---

[76] 514 F.3d 989, 998 (9th Cir. 2008).

[77] 453 F.3d 1140, 1147 (9th Cir. 2006).

[78] 905 F.2d 1212, 1216 (9th Cir. 1990).

[79] 509 F.3d 1028, 1034 (9th Cir. 2007).

Park Service Management Policies, "[t]he saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits."[80]   This policy could have been otherwise, as in *ARA Leisure Services v. Unites States*, a policy to let the road "lie lightly upon the land," effectively prioritizing aesthetics over human safety.[81]   This written, established National Park Service policy prioritizing "human life" and "injury-free visits" "over all other management actions," applicable to this case, is the sort that has been immunized as "the kind that the discretionary function exception was designed to shield."[82]   It cannot be reconciled with Superintendent Gustin's prioritizing of an identified single goat, "iconic" or not, over human safety.  The National Park Service policy provides that "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level," but not whether to address them.[83]

    In order to address this policy mandate "to protect human life and provide for injury-free visits," Olympic National Park adopted a "Nuisance and Hazardous Animal Management Plan."   Superintendent Gustin described this plan as a "guiding document that directs [employees'] activities." The "Mountain Goat Action Plan" was included in the Animal Management Plan.  The goat plan does not say one way or the

---

[80] Nat'l Park Serv., Management Policies 2006, § 8.2.5.1.

[81] *See* 831 F.2d 193, 195 (9th Cir. 1987).

[82] *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

[83] Nat'l Park Serv., Management Policies 2006, § 8.2.5.1.

other whether to kill aggressive and dangerous goats that do not respond to"aggressive hazing."  Since the park staffs killed the goat within a couple of hours of when the goat had killed Mr. Boardman, they obviously did not think the Mountain Goat Action Plan prohibited killing dangerous goats, though it did not say one way or the other. Superintendent Gustin admitted that Klahhane Billy had been managed, and was eventually killed, pursuant to the Nuisance and Hazardous Animal Management Plan.

The Nuisance and Hazardous Animal Management Plan states that individual animals may be controlled or removed only for specific reasons, one of which is to protect human health and safety.  It sets forth "a sequence of escalating management intervention and actions" for responding to dangerous animals: (1) public education and training of employees; (2) warnings and advisories; (3) monitoring and observation; (4) exclusion; (5) seasonal, non-emergency closures; (6) emergency closures; (7) aversion training; (8) capture and release; (9) capture and translocation; and (10) animal destruction.

The Park implemented some of the Plan but not all of it. Under step two, rangers verbally warned hikers and placed signs at trail heads.  They also monitored the goats under step three.   Next, they implemented aversive conditioning techniques under step seven, such as yelling and throwing rocks.   They also used paintball and bean-bag guns for aversion training. Nothing worked. All of these techniques failed. The goat just got more aggressive. Yet the Park did not move on to the next steps, relocating or shooting the goat.

Superintendent Gustin testified that "[i]f the problem isn't going away or doesn't seem to be resolved, then we move to

the next level or series of levels." Deputy Superintendent Todd Suess testified that when aversive conditioning is not working, park employees are supposed to "ramp it up and go on to the next viable action that can be taken." Dr. Patti Happe said that if aversion training is unsuccessful, her professional opinion is that the animal should be shot or removed. Finally, Richard Olson, a retired park ranger who drafted the Nuisance and Hazardous Animal Management Plan, stated that once aversive conditioning failed, the only logical next step was to shoot or relocate the problem animal. But what everyone agreed should have happened did not happen.

After two years and most of a third tourist season of unsuccessful aversive conditioning, there was nothing left to do, according to park policy, other than shoot or relocate the goat. Indeed, at the beginning of the fatal season after Klahhane Billy butted (but fortunately did not gore) a hiker, Dr. Patti Happe, the Park's chief biologist, emailed park employees that "it may be time to talk about taking the next step before someone gets hurt." She emailed the state's biologist that the goat "has become very habituated and not responding to our efforts to have him keep at a greater distance from people. Recently, he has been becoming increasingly aggressive and park management would like to explore other management options for him, including relocation from the area." Dr. Happe emailed Superintendent Gustin that the state's biologist "was very willing to help, is thinking about alternatives ranging from relocation . . . or to captivity, and will help with the capture." Gustin replied, "[t]his sounds like good news." There was no policy to the contrary, and no policy decision not to kill or relocate the goat. Nothing was done, despite the expert advice by Superintendent Gustin's chief biologist that something

needed to be done and the state's offer to help, for the rest of the season, until the goat killed Mr. Boardman.

The majority notes the broad purpose of the Organic Act to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."[84] We held in *Young v. United States* that this broad purpose does not eliminate the need for the Park Service under the more specific policy to give precedence to "saving of human life" and provide for "injury-free visits."[85]  Following *Terbush v. United States*,[86] we held in *Young* that "it is not sufficient for the government merely to wave the flag of policy as a cover for anything and everything it does that is discretionary."[87]  Though we noted that some failures to post warning signs at possible hazards were immunized policy decisions, we held in *Young* that the discretionary decision not to post a warning of a dangerous condition known to park officials but not to tourists who might encounter it was not immunized by the discretionary function exception.[88]  Our case is not a failure-to-warn case, and warning tourists without weapons of the aggressive 370-pound goat would not have done them any good anyway, unless they decided to abandon their visit to the Park.  What matters is that the

---

[84] 16 U.S.C. § 1.

[85] 769 F.3d 1047, 1056, 1057 (9th Cir. 2014).

[86] 516 F.3d 1125, 1130 (9th Cir. 2008).

[87] 769 F.3d at 1057 (internal quotation marks omitted).

[88] *Id.* at 1057, 1058.

Organic Act states a broad purpose not inconsistent with the more specific park policy of prioritizing the safety of human life.

As for goats such as Klahhane Billy, the Park Service had already decided that the Organic Act's goal of "preserving" had no application. The reason was that these goats were not indigenous to the Park. Mountain goats at Olympic National Park were classified as "exotic" species not entitled to protection. Under the National Park Service Management Policies, "[a]ll exotic plant and animal species that are not maintained to meet an identified park purpose will be managed—up to and including eradication—if (1) control is prudent and feasible, and (2) the exotic species . . . creates a hazard to public safety."[89] This policy, and not the broad purpose of conservation, spoke directly to the hazard posed by Klahhane Billy, yet this goat was not "managed up to and including eradication."

Applicability of the removal or eradication policy was not in doubt. Dr. Happe, the Park's chief biologist, testified that the Park has "taken a position that [goats] are exotic and they don't belong here." In the 1980s, the Park used helicopters to capture and remove over 400 goats, to protect native vegetation and degraded soils. Superintendent Gustin testified that the Park's goal would have been to eradicate all of the goats, but the capture program was terminated because of a change in the Park's rules for using helicopters. The government's catch-all argument about its discretion to conserve government resources, by which it evidently means money and personnel time, is a bit silly, since the failed aversive conditioning took a lot more time and money than

---

[89] Nat'l Park Serv., Management Policies 2006, § 4.4.4.2.

the couple of hours and cost of a bullet that the government expended to kill the goat after the goat killed Mr. Boardman. It verges on dark humor to suggest that protecting soil and vegetation from goats was worth using a fleet of helicopters, but protecting humans from one particular identified goat would have degraded the Park and cost too much money.

Though the government now argues, in litigation, that the Park weighed the public's desire to see goats against the safety risk from Klahhane Billy, that has no support in the record. The record is filled with reports from concerned visitors who had life-threatening encounters with the goat. They certainly did not want to see it again. In June of 2009, a year before the goat killed Mr. Boardman, Dr. Happe emailed Superintendent Gustin that the goat "is definitely negatively impacting the Park visitors ability to experience and enjoy the area trails." Another park biologist wrote that the goat "could be really scary to many people."

## CONCLUSION

There never was a discretionary decision, so far as the record shows, to delay or decline to relocate or remove the goat. All we have is a few after-the-fact declarations submitted in litigation attempting to show why such a decision, had it been made, would have been justified by policy. The express, promulgated, applicable policies directed removal or destruction of the goat. Glorifying this run-of-the-mill negligence as a government policy decision eviscerates the waiver of sovereign immunity that is the core of the Federal Tort Claims Act. This was not a policy decision like managing a failed bank, preparing fertilizer for shipment to countries ravaged by war, or approving an aircraft design. This was like not getting around to repairing

the light in the lighthouse in *Indian Towing Co. v. United States*.[90]  This case is analogous to the routine tort case, where a homeowner has a fierce dog that has attacked people and bitten one, but does not get rid of the dog until after it has torn some child's face off.[91]  This was "ordinary garden-variety negligence" that the government must compensate,[92] not "decisions of social, economic, or political policy" for which the statute preserves its immunity.[93]

We should reverse.

---

[90] *See* 350 U.S. 61, 69 (1955).

[91] *See, e.g.*, *King v. Breen*, 560 So. 2d 186 (Ala. 1990).

[92] *See ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987) (internal quotation marks omitted).

[93] *See Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005).