Opinion by Judge BYBEE; Dissent by Judge BERZON.
OPINION
BYBEE, Circuit Judge:
The discretionary function exception of the Federal Tort Claims Act (“FTCA”) immunizes the federal government from claims “based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty” on the part of the government. 28 U.S.C. § 2680(a). We consider whether, under Attorney General guidelines, the FBI’s failure to disclose information to local law enforcement regarding a home invasion threatened by private persons against unspecified victims constitutes a “failure to exercise or perform a discretionary function or duty” pursuant to § 2680(a), barring Gonzalez’s suit. We hold that the FBI’s decision whether or not to disclose was discretionary, and we affirm the judgment of the district court dismissing the suit.
I
A. Factual Allegations
Plaintiffs-Appellants Gina Gonzalez and her minor daughter, A.F. (“Gonzalez”), allege that in April 2009, the FBI learned of communications among members of the Minutemen American Defense, an activist group that advocates against illegal immigration and patrols the U.S.-Mexico border for illegal crossings.[1] That month, Shawna Forde called Ronald Wedow, another member of the Minutemen in Arizona, and told him that she knew someone in Arivaea, Arizona who would provide her with “information about illegal immigrants.” Wedow passed this information along to his friend Robert Copley, who spoke with Forde several times over the course of that month. Forde told Copley that the Minutemen planned to conduct an “operation” in Arivaea, in which they would invade a home to steal drugs, weapons, and money.
At Forde’s request, Copley set up a meeting in Aurora, Colorado at a Flying J truck stop to recruit individuals for the operation. But Copley, unbeknownst to Forde, had contacts at the FBI. And after setting up the Aurora meeting, Copley informed his FBI contact, Agent Chris Andersen, of the meeting. He asked Agent Andersen to send an undercover FBI agent to the meeting. Andersen declined, but instructed Copley to attend, gather information, and report back.
The meeting in Aurora took place on May 15, 2009. Forde, Copley, Wedow, and several others attended. Forde described her plan to invade a home in Arivaea, which she believed to be a crossroads for drug and weapons trafficking, for the purpose of “securing” it and stealing contraband that she suspected would be inside. She explained that her plan involved forming two “crews”: the first to “secure” the residents of the home, and the second to steal the drugs, weapons, and cash. She then drew a map of the area where the target home was located.
Following the meeting, Copley reported to Agent Andersen. He informed Agent Andersen of Forde’s plan to “secure” the residents of the home, explaining that “securing” meant “hitting the house like a SWAT team ... going in armed.” Copley *1026 told Andersen that he considered the threat posed by the planned invasion to be “real and imminent.” He also provided Andersen with the map showing the approximate area of the attack. Gonzalez alleges that Andersen provided the map to the Phoenix FBI office but that the map was lost in Phoenix. She also alleges that the FBI never alerted local law enforcement in Arivaca — the Pima County Sheriffs Department — of any of this information.
Fifteen days after the Aurora meeting, on May 30, 2009, three masked intruders entered Gonzalez’s home in Arivaca in the early morning hours. They fatally shot Gonzalez’s husband, Raul Flores, in view of Gonzalez and their nine-year-old daughter, B.F. They then wounded Gonzalez, shooting her in the shoulder and leg. Finally, a gunman reloaded his weapon and shot B.F. in the face, killing her instantly. The intruders withdrew from the home. Gonzalez crawled to the next room, grabbed her husband’s handgun, and called 911. While she was on the 911 call, a gunman returned and attempted to shoot Gonzalez again, and Gonzalez shot him in the leg. The intruder’s injury eventually led to the identification, arrest, and prosecution of the three perpetrators. One of them was Shawna Forde.
B. Proceedings
Gonzalez filed a complaint in U.S. District Court for the District of Arizona on behalf of herself and her surviving daughter, A.F., who was at her grandmother’s house at the time of the attack. The complaint alleged that the United States is liable under the FTCA for damages arising out of the attack because the FBI negligently failed to disclose the information about the impending home invasion to local law enforcement, in contravention of the Attorney General’s Guidelines for Domestic FBI Operations (“Guidelines”). Section VI(C)(2) of these Guidelines provides that the FBI “shall promptly transmit” to local law enforcement information concerning “serious criminal activity not within the FBI’s investigative jurisdiction,” unless disclosure would compromise an ongoing investigation, endanger others, or reveal privileged information. Gonzalez and A.F. sought damages for the wrongful death of Raul Flores and B.F. Gonzalez also sought damages for her own personal injuries, pain, and suffering.
The United States filed a motion to dismiss, arguing, among other things, that the court lacked subject matter jurisdiction over this FTCA case because of the discretionary function exception. The district court granted the motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The court denied Gonzalez’s request for jurisdictional discovery as futile. Gonzalez v. United States, No. CV 12-00375, 2013 WL 308762, at *7-8 (D.Ariz. Jan. 25, 2013). Gonzalez filed a timely appeal to this court.
II
The FTCA authorizes private suits against the United States for damages for loss of property, injury, or death
caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
28 U.S.C. § 1346(b)(1). The Act operates as a limited waiver of sovereign immunity from suits for negligent or wrongful acts of government employees, United States v. Gaubert, 499 U.S. 315, 318 n. 4, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), which constitute “ordinary common-law torts,” Dale *1027 hite v. United States, 346 U.S. 15, 28, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). See 28 U.S.C. § 2674 (the United States is liable for tort claims “in the same manner and to the same extent as a private individual under like circumstances”).
There are several exceptions to the FTCA. The exception relevant for our purposes is the discretionary function exception, which provides that the government has not waived immunity for claims
based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [is] abused.
28 U.S.C. § 2680(a). This exception “prevent[s] judicial ‘second-guessing’ of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.” United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The “discretion protected by [§ 2680(a) ] .... is the discretion of the executive or the administrator to act according to one’s judgment of the best course, a concept of substantial historical ancestry in American law.” Dalehite, 346 U.S. at 34, 73 S.Ct. 956 (internal quotation marks omitted). Accordingly, “[w]here there is room for policy judgment and decision there is discretion.” Id. at 36, 73 S.Ct. 956. The government bears the burden of demonstrating that the discretionary function exception applies. GATX/Airlog Co. v. United States, 286 F.3d 1168, 1174 (9th Cir.2002). Where the exception applies, the United States has not waived its sovereign immunity and we lack subject matter jurisdiction over the claims. Id. at 1173; see United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); United States v. Park Place Assocs., Ltd., 563 F.3d 907, 924 (9th Cir.2009) (explaining that the FTCA waiver of sovereign immunity is coextensive with the conferral of jurisdiction (citing 28 U.S.C. § 1346)).
The Supreme Court has prescribed a two-part test for determining' whether the discretionary function exception applies. Berkovitz v. United States, 486 U.S. 531, 536-37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, courts are to ask whether the challenged action was a discretionary one — “that is, it must involve an element of judgment or choice.” GATX/Airlog Co., 286 F.3d at 1173 (citing Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954). In addition to duties prescribed by the common law torts “of the place where the act or omission occurred,” 28 U.S.C. § 1346(b)(1), federal employees must follow “federal statute[s], regulation^], or policies that] specifically prescribe[ ] a course of action for an employee to follow,” GATX/Airlog Co., 286 F.3d at 1173. In such cases, “the employee has no rightful option but to adhere to the directive,” and the discretionary function exception does not apply. Id. at 1174. Thus, where conduct violates a mandatory directive and is not “the product of judgment or choice,” it is not discretionary. Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954. This step is called the “discretionary act” prong of the discretionary function exception analysis. See Sabow v. United States, 93 F.3d 1445, 1451 (9th Cir.1996).
If the conduct involves an element of judgment, the court then determines “whether that judgment is of the kind that the discretionary function exception was designed to shield.” Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954. The focus of this second step is “not on the agent’s subjective intent in exercising the discretion conferred by statute or regulation,” but rather “on the nature of the actions taken and on whether they are susceptible *1028 to policy analysis.” Gaubert, 499 U.S. at 325, 111 S.Ct. 1267. “The decision need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis.” GATX/Airlog Co., 286 F.3d at 1174 (internal quotation marks omitted). According to the Court, “if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.” Gaubert, 499 U.S. at 324, 111 S.Ct. 1267. Thus, “[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent’s acts are grounded in policy when exercising that discretion.” Id. We refer to this as the “policy judgment” prong. See Sabow, 93 F.3d at 1451.
Ill
We begin with the first prong of the discretionary function exception analysis, the discretionary act prong. We first address whether the Guidelines impose upon FBI agents a mandatory duty to disclose information to local law enforcement. Because Gonzalez also contends that additional discovery would have helped her show the mandatory nature of the Guidelines, we also discuss whether the district court abused its discretion in denying Gonzalez further discovery. Concluding that the FBI has discretion in its investigative decisions, we then turn to the policy judgment prong.[2]
A. Discretionary Act
1. The FBI’s decision whether or not to disclose information regarding potential threats is discretionary
We first consider whether the challenged government action involves discretion. There is no common law analog in tort law. Thus, we are looking to see if there is some kind of “federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow.” Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954.
We know of no statute or regulation— and Gonzalez has not directed us to any— that prescribes a course of action for the FBI and its agents to follow in the investigation of crime. This is not surprising. The investigation and prosecution of crime has long been a core responsibility of the executive branch. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) (“One of the first duties of government is to afford ... protection.”); see also Corfield v. Coryell, 6 F. Cas. 546, 551 (C.C.E.D.Pa.1823) (No. 3,230) (Washington, J.) (The fundamental privileges of citizenship include “[protection by the government”). Outside of the FTCA context, the “Court has recognized on several occasions over many years that an agency’s decision not to prosecute or enforce, whether through civil, or criminal process, is a decision generally committed to an agency’s absolute discretion.” Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). “This recognition ... is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement.” Id.; see Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (“[T]he decision to prosecute is par *1029 ticularly ill-suited to judicial review.... [T]he Government’s enforcement priorities, and ... overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.”); see also Imbler v. Pachtman, 424 U.S. 409, 431 n. 33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (preparation for indictment involves the “obtaining, reviewing, and evaluating of evidence,” which requires “mak[ing] decisions on a wide variety of sensitive issues”).
Gonzalez has argued, nevertheless, that the Attorney General has prescribed guidelines for the conduct of investigations that supply a mandatory duty applicable to the FBI agents involved here. Section VI(C)(2) of the Attorney General’s Guidelines for Domestic FBI Operations governs the FBI’s disclosure of information to local law enforcement. Under the portion titled “Criminal Matters Outside FBI Jurisdiction,” the Guidelines state in relevant part:
When credible information is received by an FBI field office concerning serious criminal activity not within the FBI’s investigative jurisdiction, the field office shall promptly transmit the information or refer the complainant to a law enforcement agency having jurisdiction, except where disclosure would jeopardize an ongoing investigation, endanger the safety of an individual, disclose the identity of a human source, interfere with a human source’s cooperation, or reveal legally privileged information. If full disclosure is not made for the reasons indicated, then, whenever feasible, the FBI field office shall make at least limited disclosure to a law enforcement agency or agencies having jurisdiction, and full disclosure shall be made as soon as the need for restricting disclosure is no longer present.
Guidelines § VI(C)(2). The district court concluded that in spite of mandatory-sounding language — “the field office shall promptly transmit” — the Guidelines “as a whole, ... as well as the factors set forth for consideration, clearly refute[ ] the conclusion that Guideline § VI(C)(2) mandated disclosure.” Gonzalez, 2013 WL 308762, at *5. The court observed that an FBI agent must decide whether the information is credible, whether the criminal activity is serious, and whether there is any other reason relating to the FBI’s other operations that counsels against transmitting the information. Id.
In our view, the district court correctly concluded that the Guidelines do not prescribe a mandatory course of conduct with respect to the FBI’s sharing of information with state or local law enforcement agencies. Law enforcement officers must regularly make judgment calls with respect to information sharing. They must consider the source of the information, its credibility, and the amount of detail in the information. FBI agents, like detectives and police officers, must evaluate whether the information requires immediate action, deferred action, or no action at all. They have to make myriad judgments about how the potential for future criminal activity fits the agency’s mission and enforcement priorities. Indeed, agents may disagree among themselves about the significance or credibility of information they receive. None of the answers to these questions are dictated by the Attorney General’s Guidelines. The Guidelines provide no criteria for determining what is “credible information” or what constitutes “serious criminal activity.” Courts have consistently held that where, as here, a government agent’s performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies. See, e.g., Conrad v. United States, 447 F.3d 760, 765-66 (9th Cir.2006) (holding that where a criminal procedural rule provided that the government “must take the defendant without unnecessary delay ” before a judge, the “exercise of judgment” was re *1030 quired in determining “how much delay is necessary”); Ochran v. United States, 117 F.3d 495, 500-01 (11th Cir.1997) (holding that Attorney General Guidelines for witness protection were discretionary; “[e]ven though the Guidelines require the AUSA to arrange for the reasonable protection of a victim who is threatened, they did not specify how this protection is to be provided”); Kelly v. United States, 924 F.2d 355, 358, 360-61 (1st Cir.1991) (holding that where a DEA manual provided that any bureau chief receiving an “allegation or complaint” indicating a possible leak of confidential DEA information “will [ijmmediately notify” internal security personnel, bureau chiefs had “discretion to determine what comprised an ‘allegation’ or ‘complaint’ ”).
Even if an agent receives information that is credible and suggests serious criminal activity, an agent may choose not to disclose information based on his consideration of the possible effects of disclosure, such as the effect of disclosure on an informant, other individuals, or an ongoing investigation. An FBI agent must first weigh these various considerations, each committed to his discretion, before he “shall promptly transmit the information.” Additionally, “the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.” Sabow, 93 F.3d at 1453; cf. Vickers v. United States, 228 F.3d 944, 953 (9th Cir.2000) (concluding that a regulation requiring prompt investigation of an allegation of misuse of Service-issued firearms is mandatory; “although INS investigators undoubtedly enjoy discretion in the conduct of an investigation, this discretion does not extend to the question of whether to report to superiors or to investigate at all an allegation of misuse of Service-issued firearms”). Viewed in context, mandatory-sounding language such as “shall” does not overcome the discretionary character of the Guidelines.
Gonzalez argues that while the Guidelines permit the FBI to make partial disclosure of information, the Guidelines do not permit the FBI to fail to warn entirely. However, nothing in the Guidelines supports Gonzalez’s interpretation. The predicate for any action by an agent is a judgment that the FBI has come into “credible information.” Only if the agent makes that decision — a decision fraught with judgment based on context, experience and expertise — does the Guideline even apply. Only then do the Guidelines state that an officer “shall promptly transmit the information.” Even then, the Guidelines provide an exception: “except where disclosure would” implicate any of the five circumstances listed, suggesting that in those circumstances, disclosure is not required. Furthermore, the Guidelines provide that if disclosure is not made for any of those reasons, then partial disclosure shall only be made “whenever feasible” — another judgment call. The dissent argues that “any regulation that sets out criteria for action” requires government officials to determine “whether those criteria are or are not satisfied,” and that this does not render an otherwise mandatory policy discretionary. Dissenting Op. at 1039. That may be true. But that argument ignores the specific regulations at issue here. The FBI’s Guidelines clearly contemplate everything from full disclosure to partial disclosure to non-disclosure, thus giving the agents discretion to make a “case-by-case evaluation” regarding the need to disclose. And, as we said in Weissich v. United States, 4 F.3d 810, 814 (9th Cir.1993), “A ‘case-by-case’ evaluation presumes significant officer discretion.”[3] The *1031 district court properly concluded that the Guidelines do not prescribe a mandatory duty.
2. The district court did not abuse its discretion in denying discovery
Gonzalez requested “discovery regarding the policy set forth in the Attorney General’s Guidelines for Domestic FBI Operations, § VI(C)(2), including any agency interpretations of that rule and the custom and practice of how that rule is obeyed.” The district court denied Gonzalez’s request, concluding that the text of the Guidelines makes clear that it permits agency discretion, and thus efforts to obtain evidence regarding the custom and practice of how that rule is obeyed would be futile. Gonzalez, 2013 WL 308762, at *8.
On appeal, Gonzalez contends that the district court abused its discretion when it denied her leave to take jurisdictional discovery. To show that she was prejudiced by that denial, Gonzalez seeks to supplement the record with a document called the FBI Domestic Investigations and Operations Guide (“DIOG”), which was published in 2011. The DIOG provides, in relevant part:
[W]hen an employee has information that a person ... who is identified or can be identified through reasonable means is subject to a credible threat to his/her life or of serious bodily injury, the employee must attempt expeditiously to notify other law enforcement agencies that have investigative jurisdiction concerning the threat.
DIOG § 14.7.3.2.1.1 (“Threats to Intended Persons”). The DIOG further provides that “[wjhenever time and circumstances permit, an employee’s decision not to provide notification to another law enforcement agency in the foregoing circumstances must be approved by an ASAC or higher.” Id. § 14.7.3.2.2. Though the 2011 DIOG was created and published after the home invasion occurred in 2009, Gonzalez offers some evidence to suggest that the DIOG “incorporates several older, separate policies” dating back to 2008. Gonzalez did not raise the relevance of the DIOG with the district court.
Absent extraordinary circumstances, we generally do not permit parties to supplement the record on appeal. United States v. Boulware, 558 F.3d 971, 976 (9th Cir.2009); Lowry v. Barnhart, 329 F.3d 1019, 1024 (9th Cir.2003). Gonzalez has not demonstrated that extraordinary circumstances are present here.
Even if we were to consider the DIOG, Gonzalez’s prejudice argument is tenuous. To be sure, like the Attorney General’s Guidelines, the DIOG employs some mandatory-sounding language. However, *1032 granting Gonzalez the assumption that the relevant language in this 2011 document applied at the time of the 2009 home invasion, the DIOG is replete with discretionary determinations. The threat must be “credible,” and the threat must be against a “person who is identified or can be identified through reasonable means.” Even if these criteria are satisfied, the employee must “attempt expeditiously” to contact other law enforcement agencies. This is not the language of “a specific statutory [or] regulatory directive.” Berkovitz, 486 U.S. at 542-43, 108 S.Ct. 1954. And in this case, there is no allegation that Agent Andersen had any specific identifying information about any potential victims. The complaint stated only that Copley gave Agent Andersen a map showing the “approximate location” of the targeted home, and gave no indication that this map afforded the FBI “reasonable means” by which to identify the targeted victims. Thus, even if we were to consider the DIOG, the document does not show that Gonzalez was prejudiced by the district court’s denial of discovery. The district court did not abuse its discretion.
B. Policy Judgment
We turn next to the policy judgment prong of the discretionary function exception analysis. Under this prong, we address whether FBI decisions made pursuant to the Guidelines are susceptible to policy judgment. We then address whether the “design-implementation” distinction applies here.
1. The FBI’s decision whether to disclose information is the type of decision that Congress intended to shield from FTCA liability
Under the policy judgment prong, we assess whether the challenged conduct involves the exercise of policy judgment. In determining if the conduct involves policy judgment, we do not look to an agent’s subjective weighing of policy considerations. Rather, we examine the nature of the Government’s action — or in this case, omission — and decide whether it is “susceptible” to policy analysis under an objective assessment. Gaubert, 499 U.S. at 325, 111 S.Ct. 1267.
Because we conclude above that the Guidelines permit discretion, a “strong presumption” arises that the FBI’s actions were grounded in policy considerations. Id. at 324, 111 S.Ct. 1267. Therefore, we must presume that when the FBI declined to disclose information regarding the Minutemen threat to local law enforcement, its actions resulted from a policy judgment. See, e.g., Alfrey v. United States, 276 F.3d 557, 564 (9th Cir.2002) (concluding that because “federal regulations expressly give prison officials discretion in how to respond to reports of threats!,].... it must be presumed that the officials’ choices in responding to the report of [an inmate’s] threat were based in public policy”).
Even absent that presumption, the FBI conduct challenged here clearly involves the type of policy judgment protected by the discretionary function exception. The investigation of crime involves policy judgments at the core of the executive branch. In investigations, no less than prosecutions, the executive must consider the reliability of the information, the relative importance of the crime, and the agency’s mission and resources. See Red Lake Band of Chippewa Indians v. United States, 800 F.2d 1187, 1193, 1198 (D.C.Cir.1986) (holding that where FBI allegedly received “warnings that something might happen” and “failed to make adequate plans” to prevent a violent confrontation on Native American land, the discretionary function exception applied because “[l]aw enforcement personnel receive warnings, rumors and threats all the time [and] are constantly required to assess the *1033 reliability of the information they receive, and to allocate scarce personnel resources accordingly). As the Guidelines make evident, any agent choosing whether to disclose information must weigh the credibility and seriousness of the threatened criminal activity against the possible risks — to an informant, if disclosure might reveal his cooperation with the government; to an intended victim, if disclosure might put him in greater danger; to other potential victims, if disclosure might also endanger them; or to ongoing investigations, if disclosure might jeopardize their success. These considerations surely implicate social, economic, and political judgments. See Varig Airlines, 467 U.S. at 814, 104 S.Ct. 2755. Thus, the FBI’s nondisclosure of information is the type of conduct to which a policy analysis could apply. See Weissich v. United States, 4 F.3d 810, 813 (9th Cir.1993).
Our conclusion finds support in our decision in Alfrey v. United States. There, the wife of a prison inmate alleged that prison officials responded negligently to threats by her husband’s cellmate, resulting in her husband’s death. 276 F.3d at 563-64. Specifically, she argued that the officers failed to search the two men’s cell in a manner that would have enabled them to find the murder weapon and failed to run an investigatory search on the cellmate using the prison’s computer database. Id. We concluded that both omissions implicated social and public policy considerations. Id. at 565. “A prison official’s judgment about how extensively to search a cell,” we explained, “involves a balancing of the potential risk, on the one hand, against the inmate’s interest in being free from overly intrusive searches, on the other.” Id. Moreover, “to decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison.” Id. Our reasoning in Alfrey applies equally to the FBI’s nondisclosure of information. The FBI’s judgment about how to respond to a reported threat and how extensively to disclose information to other law enforcement organizations implicates many risks, all of which must be weighed in accordance with the FBI’s social and public policy judgments.
We note that our decision remains the same whether or not Agent 'Andersen’s decision in fact involved the subjective weighing of policy considerations. Gonzalez contends that the government may be liable for Agent Andersen’s actions if his failure to disclose the information in his possession was not actually the result of an exercise of policy-based discretion. A lazy or careless failure to disclose, Gonzalez posits, would not be shielded under the discretionary function exception. We disagree. To the contrary, the government is not required to prove either that an affirmative decision was made, or that any decision actually involved the weighing of policy considerations, in order to claim immunity. Terbush v. United States, 516 F.3d 1125, 1136 n. 5 (9th Cir.2008) (“Of course, after Gaubert we do not need actual evidence that policy-weighing was undertaken.”); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1028 (9th Cir.1989) (“[W]e [have] expressly rejected [the] argument that the discretionary function exception cannot apply in the absence of a conscious decision.” (internal quotation marks omitted)). In Alfrey, we concluded that the prison officials’ failure to run a computer database search required weighing policy considerations — including balancing “the risk presented by the reported threat, along with the other risks that inevitably arise in a prison” — without inquiring into whether any prison official was in fact guided by those considerations. 276 F.3d at 565.
*1034 Here, too, we need not examine whether Andersen did or did not weigh the Guidelines’ policy considerations. The discretionary function exception applies so long as the challenged decision is one to which a policy analysis could apply.[4] Weissich, 4 F.3d at 813. We made clear the fundamental problem with adopting Gonzalez’s proposed approach in In re Consolidated U.S. Atmospheric Testing Litigation, where we considered whether the discretionary function exception shielded the government’s alleged failure to warn nearby military and civilian persons of the health dangers of its nuclear testing activities:
If the decision to issue or not to issue a “warning” is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a “decision”? Would a decision to defer decision be a “decision”?
820 F.2d 982, 998-99 (9th Cir.1987). Gaubert and our case law require us to conclude that nondisclosure resulted from a policy judgment, whether or not the judgment was negligently made or not made at all.[5]
2. The design-implementation distinction does not apply to permit suit against the government in this case
Gonzalez argues that the FBI’s failure to disclose information did not implicate policy concerns under a doctrine that we have termed the “design-implementation distinction.” See Whisnant v. United States, 400 F.3d 1177, 1181 n. 1 (9th Cir.2005). We have held that, in some cases, “the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not.” Id. at 1181. So, for example, the government exercises policy judgment when determining whether and when to construct a lighthouse, but once it has constructed that lighthouse, it must “use due care to make certain that the light was kept in *1035 good working order.” Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Thus, on occasion, we have required the government to face liability for “a failure to effectuate' policy choices already made.” Camozzi v. Roland/Miller & Hope Consulting Grp., 866 F.2d 287, 290 (9th Cir.1989). However, as we discuss in greater detail below, we have cautiously applied this doctrine and we have applied it largely in cases involving public health and safety, and in circumstances where a private party would likely be held liable for the same conduct or omission. See, e.g., Terbush, 516 F.3d at 1132-33 (maintaining wastewater management system); Bolt v. United States, 509 F.3d 1028, 1033-34 (9th Cir.2007) (removing snow from parking lot); Soldano v. United States, 453 F.3d 1140, 1148-49 (9th Cir.2006) (setting safe speed limit on road); Whisnant, 400 F.3d at 1182-83 (removing mold from meat commissary); Marlys Bear Medicine v. United States, 241 F.3d 1208, 1215 (9th Cir.2001) (monitoring safety at logging operation); Camozzi, 866 F.2d at 290 (inspecting floors for unguarded openings).
Gonzalez offers two theories for why we should employ this doctrine here. First, she argues that while the Attorney General’s original design and promulgation of the Guidelines are protected policy judgments, decisions implementing the Guidelines are mere unprotected “professional judgments.” Second, she suggests that the government may also be liable under the design-implementation theory if Agent Andersen had, in fact, decided to disclose the information he had to, local law enforcement, but the FBI negligently failed to implement that decision.[6]
Neither theory is sustainable. For the reasons we have discussed, FBI agents responsible for following the Attorney General’s Guidelines are still imbued with an enormous amount of discretion and judgment in the course of their investigations. We have made clear that the doctrine does not permit liability where, as here, “the implementation itself implicates policy concerns.” Whisnant, 400 F.3d at 1182 n. 3. To conclude otherwise would simply swallow the two-step, discretionary act and policy judgment analysis the Supreme Court set forth in Berkovitz. See 486 U.S. at 536, 108 S.Ct. 1954.
Gonzalez’s alternate theory — that Agent Andersen designed a plan that he or others failed to implement properly — fares no better. Whatever Andersen decided to do, and whatever his colleagues in Phoenix did in response, those acts were taken in the course of an exercise in policy judgment. The fact that one or more agents concocted a plan does not make that plan an irreversible agency mandate. Agent Andersen does not bind the United States in tort by deciding to share or not to share information, even if he (or someone else) does not follow up on his plan.
Our decision in Weissich v. United States is instructive. There, we considered whether the discretionary function exception immunized the United States *1036 Probation Service’s (“USPS”) failure to supervise adequately a probationer who threatened to kill the district attorney who prosecuted him, and later successfully carried out his threat. 4 F.3d at 812. After concluding that regulations governing probation conditions did not impose a mandatory course of conduct on probation officers, we concluded that supervisory decisions require balancing an officer’s “dual obligations to (1) protect the public, and (2) promote the rehabilitation of the probationer.” Id. at 814. Plaintiffs there made a similar argument to the one we confront here, contending that USPS “negligently supervised [the probationer] by failing to carry out its own plan of supervision and failing to enforce the terms of [his] probation.” Id. Significantly, we declined the plaintiffs invitation to sift through the probation officers’ actions and identify those indicating USPS’s failure to implement their probation plan. Rather, we acknowledged that while “[p]erhaps the officers should have decided to supervise [the probationer] more closely,” and “[p]erhaps ... unannounced home visits might have been more appropriate,” these were “judgment calls.” Id. The United States had no liability “even if it was negligent in supervising” the probationer. Id. at 815.
Weissich demonstrates that even if the FBI negligently failed to carry out its own plan of disclosing information to local law enforcement, our focus remains on the discretionary and policy-based nature of the Guidelines’ disclosure determination. Because the Guidelines are discretionary and involve policy considerations, we cannot parse out the FBI’s nondisclosure into “decision” and “implementation” phases. Nor may we conclude that simply because the Attorney General employed policy-based considerations in promulgating the Guidelines, any subsequent decision taken pursuant to those Guidelines is devoid of policy-based considerations. Such conclusions would permit the design-implementation distinction to override the discretionary function exception analysis in contravention of the Court’s clear command: we look first to whether a policy permits an agent discretion, and if it does, then we must presume that an agent’s act or omissions are grounded in policy, whether or not we suspect that the discretion involved has been abused. Gaubert, 499 U.S. at 324, 111 S.Ct. 1267; 28 U.S.C. § 2680(a).
Fundamentally, the decision whether or not to disclose information under the Guidelines, like the day-to-day decisions involved in rehabilitating a probationer, requires considerations of public safety, allocation of scarce resources, and the likelihood of success. See Weissich, 4 F.3d at 814; see also Sabow, 93 F.3d at 1453. Because such interests will often conflict or will not be apparent, balancing the 'various political, social, and economic considerations is inherent in the officer’s judgment. See Weissich, 4 F.3d at 814. Far from “ordinary occupational or professional judgments,” the FBI’s decision whether to disclose information “clearly involve[s] the type of policy judgment protected by the discretionary-function exception.” Alfrey, 276 F.3d at 566 (“[Ijnvestigations by federal officers clearly involve the type of policy judgment protected by the discretionary-function exception.”); cf. Soldano, 453 F.3d at 1148 (“Setting a safe speed limit for the Road as designed ... is essentially a matter of scientific and professional judgment.”); Sigman v. United States, 217 F.3d 785, 795-96 (9th Cir.2000) (concluding that- the discretionary function exception does not apply to a “garden-variety medical malpractice” claim against a military physician, because it involves “a function that is analogous to functions performed by professionals in the private sphere every day”). The FBI’s judgment whether to disclose information under the Guidelines implicates policy considerations for *1037 the reasons described above, and therefore, the design-implementation distinction does not apply on these facts.
The Guidelines vest discretion and policy judgment in the FBI. Thus, the district court properly concluded that the government satisfied both prongs of the discretionary function exception. Moreover, the district judge did not abuse her discretion in denying Gonzalez’s request for jurisdictional discovery.
IV
It is tempting to wonder whether a simple warning to local law enforcement could have prevented the tragic deaths of Gonzalez’s husband and daughter. But we are not charged with passing upon the wisdom of the government’s exercise of discretion, and the law does not permit us to do so, “whether or not the discretion involved [is] abused.” 28 U.S.C. § 2680(a). Choices such as these — to disclose or not to disclose- — are among the judgment-laden decisions the discretionary function exception was enacted to shield. We decline to use the tort laws to monitor the executive’s exercise of its judgment. The judgment of the district court is
AFFIRMED.

. When, a defendant brings a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and asserts that the allegations in the plaintiff's complaint are insufficient to establish subject matter jurisdiction as a matter of law, we take the allegations in the plaintiff's complaint as true. Whisnant v. United States, 400 F.3d 1177, 1179 (9th Cir.2005).

. We review de novo a dismissal for lack of subject matter jurisdiction under the FTCA. Green v. United States, 630 F.3d 1245, 1248 (9th Cir.2011). Denials of motions to compel discovery are reviewed for abuse of discretion. Dichter-Mad Family Partners, LLP v. United States, 709 F.3d 749, 751 (9th Cir.2013) (per curiam).

. Cases like Tobar v. United States, 711, F.3d 938 (9th Cir.2013), in which officials are re *1031 quired to determine the existence of objective, independently ascertainable conditions, are inapposite here. As the dissent observes, the fact that a Coast Guard enforcement manual requiring the owner of a vessel to be compensated if there are no drugs on board and the vessel is damaged, see Tobar, 731 F.3d at 946, does not give Coast Guard officials "discretion” just because it requires the officials to exercise some judgment in determining whether the conditions of the rule apply. See Dissenting Op. at 1039-40. But the dissent ignores the fact that judgments regarding compensation to be paid to vessel owners required in Tobar and judgments regarding what investigative evidence should be passed on to other offices and local offices in the FBI’s Guidelines are completely different in kind. The criteria agents must consider in determining whether to disclose information involve exactly the kind of policy judgments to which the discretionary function exception applies, as we discuss in detail in Part III.B. The fact that the "structure” — the logical form — of the Guidelines here and the Coast Guard's manual at issue in Tobar is "identical” does not render the Guidelines here automatically mandatory. Dissenting Op. at 1039.

. Even if the FBI negligently conducted an investigation, that does not detract from the fact that the manner of conducting an investigation, including decisions to share or not to share information with other agencies, is rife with discretion and policy judgment and not appropriate for judicial review in a tort action. See Gaubert, 499 U.S. at 334, 111 S.Ct. 1267; Kennewick, 880 F.2d at 1029 ("[I]f the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability.”). The statute makes clear that where there is discretion, the government has not waived its sovereign immunity "whether or not the discretion involved [is] abused.” 28 U.S.C. § 2680(a).

. The dissent cites Miller v. United States, 163 F.3d 591 (9th Cir.1998), for the proposition that the government must show that one of the five "exceptions” to disclosure actually applied here. Dissenting Op. at 1041-42. In Miller, we determined that Forest Service guidelines about how to fight fires gave the Forest Service discretion to depart from the guidelines in a "multiple fire situation,” a situation that was clearly present during the events giving rise to the suit. Id. at 594-95. Accordingly, the dissent reasons that the government must demonstrate here that a situation requiring non-disclosure was present. But Miller does not require this — in fact, Miller agrees that a decision "need not be actually grounded in policy considerations” for the discretionary function exception to apply. Miller, 163 F.3d at 593. Furthermore, determining whether the "multiple fire situation” trigger was present did not itself require a policy judgment (i.e., there either is more than one fire, or there is not). Here, by contrast, determining whether the conditions permitting non-disclosure are even present requires the FBI to make the kinds of policy judgments protected by the discretionary function exception. The government need not demonstrate that its decision not to disclose was actually based on a policy analysis.

. Gonzalez never alleged that Agent Andersen actually made a decision to alert local law enforcement. At most, the complaint alleged that Agent Andersen provided the map to the Phoenix branch of the FBI. Transmitting the map from one FBI office to another does not indicate that Andersen intended to alert local law enforcement of the threat.
Gonzalez contends that she should have been permitted discovery to obtain "those FBI documents that describe what actions were taken by FBI personnel after learning of the home invasion plans discussed at the recruiting meeting arranged by FBI informant Robert Copley.” As we discuss below, however, this was not an abuse of discretion because any negligence that occurred as a result of Agent Andersen's actions is not sufficient to bring this case within the discretionary function exception. See also supra note 3.